IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BAIDEHI L. MUKHERJEE, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 16-01291-CV-W-ODS |
| THE CHILDREN'S MERCY HOSPITAL, | ) |
| Defendant. | ) |

<u>ORDER AND OPINION (1) GRANTING IN PART, DENYING IN PART, AND
DEFERRING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
AND (2) DIRECTING PARTIES TO FILE SUPPLEMENTAL BRIEFING</u>

Pending is Defendant's Motion for Summary Judgment. Doc. #70. For the following reasons, Defendant's motion is granted in part and denied in part, and the Court defers ruling in part.

## I. BACKGROUND

Plaintiff Baidehi L. Mukherjee is a woman of Indian national origin and Asian descent. Plaintiff began working for Defendant The Children's Mercy Hospital on July 9, 2012, as Director of Technology Development. Her starting biweekly pay rate was $6,154.40. Defendant also paid Plaintiff $16,000 in relocation assistance, and paid more than $14,000 to transfer Plaintiff's work authorization to Defendant. In her position, Plaintiff was responsible for activities that promoted and facilitated the commercialization of inventions arising out of professional activities by Defendant's personnel. She communicated with inventors and intellectual property law attorneys regarding inventions, and facilitated communications between them. Plaintiff also negotiated license agreements and other related agreements to promote commercialization of newly discovered technologies.

In August 2013, Plaintiff received her first performance evaluation from her supervisor, Warren Dudley, then-Vice President of Market Development and Outreach. Dudley wrote, among other things, for the Technology Development Office "to grow and add the most value to CMH, it will be very important for Luna to develop positive

relationships both within CMH and with the supporting external groups." Doc. #71-16, at 5. He further stated, "[t]here are indications that Luna and her communications are not being perceived by others in the way that Luna intends. It will be important for Luna to work with our H[uman] R[esources] team to identify courses offered internally or possibly externally that can support the development of communication skills." *Id*.

On January 24, 2014, Plaintiff received a written warning. Therein, Dudley indicated, among other things, Plaintiff, contrary to his instructions, was not copying him on communications to potential licensing partners or on monthly updates with a researcher. Doc. #71-18. He stated Plaintiff refused to follow directions and work on certain projects. Plaintiff was advised that failure to show "immediate, significant, and sustained improvement" could result in further counseling up to and including termination.

On February 3, 2014, Plaintiff submitted an Employee Complaint Report to Defendant's Human Resources Department. Plaintiff stated, among other things, her supervisor lodged false allegations against her, he "target[ed]" her because she is a "highly talented minority of a different national origin," he was "verbally abusive," and "created a hostile work environment." Doc. #71-20, at 3-3. She stated her supervisor "wrongly [sic] set idea as to the role of women, and foreign born persons. There has always been an underlying current of bigotry but I had hoped that over time…he would learn to appreciate talented individuals like me." *Id*. at 7. Plaintiff asked for a change of manager, or that she be allowed to work on her own. According to Defendant, Plaintiff's complaint was investigated, and the investigation uncovered insufficient evidence to suggest unfair or inequitable treatment of Plaintiff. Plaintiff appealed the investigatory findings. She was informed by the Executive Vice President and the Vice President of Human Resources that the written warning was an appropriate measure, and Plaintiff was treated fairly and in a manner consistent with Defendant's policy.

On April 4, 2014, Dudley gave Plaintiff a final written warning. According to Dudley, Plaintiff continued to refuse to do things, she did not provide monthly updates to him, did not complete development courses, did not provide the required amount of education and sharing necessary for her position, and her communication skills had not improved. Dudley directed Plaintiff to provide a written development plan of how she

planned to achieve progress related to her communication skills and repairing relationships. Dudley also required Plaintiff to provide certain lists, reports, and summaries to him. Plaintiff was instructed to organize an educational seminar for Defendant's employees to increase understanding and knowledge of intellectual property and technology transfer. She was informed that failure to follow the plan for improvement would result in further counseling up to and including termination.

On April 14, 2014, Plaintiff submitted another Employee Complaint Report. Her complaint was for "discrimination, harassment, retaliation, hostile work environment, tarnishing my reputation, making false allegations, causing professional and personal harm." Doc. #71-28, at 2. Plaintiff averred she was working "in a hostile work environment and I am being attacked wrongfully [for] being a female minority foreign born professional." *Id*. She claimed Dudley had become "extremely aggressive and vindictive towards" her in that he banged on her door, towered over her, refused to make eye contact, and was verbally abusive. According to Defendant, Plaintiff's complaint was investigated, and the investigation uncovered no evidence to support her claim of unfair or unequitable treatment. According to Defendant, Plaintiff failed to meet performance expectations, and the final written warning would remain in her file. Plaintiff appealed the investigatory findings. She was informed by the Executive Vice President and the Vice President of Human Resources that the final written warning was an appropriate measure, and Plaintiff was treated fairly and in a manner consistent with Defendant's policy.

According to Defendant, it chose to discharge Plaintiff because she failed to develop collaborative relationships with researchers, failed to comply with multiple directives from Dudley over the course of several months, and failed to make immediate, significant, and sustained improvement in the areas identified in the written warnings. Plaintiff's employment with Defendant concluded on May 7, 2014.

On May 17, 2014, Plaintiff submitted another Employee Complaint Report. Plaintiff's complaint was for "discrimination, wrongful termination of employment, harassment, retaliation, hostile work environment, making false allegations, professional and personal harm." Doc. #71-30, at 1. According to Defendant, Plaintiff's complaint was investigated. At the conclusion of the investigation, Plaintiff was informed her

"refusal to meet the expectations set by your manager ultimately led to your termination. As such, your termination will stand." Doc. #71-32. Plaintiff appealed the investigatory findings. She was informed by the Executive Vice President and the Vice President of Human Resources that her discharge was an appropriate measure, and she was treated fairly and in a manner consistent with Defendant's policy.

In December 2016, Plaintiff initiated this matter. In her First Amended Complaint, Plaintiff alleges Defendant discriminated against her on the basis of her race, color, sex, religion, national origin, and ancestry under the Missouri Human Rights Act ("MHRA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). Doc. #4. Plaintiff also maintains Defendant created a hostile work environment on the basis of her race, color, sex, religion, national origin, and ancestry under the MHRA, Title VII, and Section 1981. She contends Defendant retaliated against her, in violation of the MHRA, Title VII, and Section 1981, for exercising her rights under state and federal discrimination laws. Plaintiff alleges Defendant willfully violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Finally, Plaintiff maintains Defendant defamed her and appropriated her privacy and publicity. On February 13, 2018, the parties stipulated to the dismissal of Plaintiff's defamation and religious discrimination claims with prejudice. Doc. #84. Defendant now seeks summary judgment on all remaining claims.

## II.     STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). The Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.

4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984). "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (citations omitted).

### III. DISCUSSION
#### A. Plaintiff's MHRA Claims

Defendant contends it is entitled to summary judgment on Plaintiff's MHRA claims because Plaintiff did not file her lawsuit within the two-year statute of limitations period. An action brought in court under the MHRA "shall be filed…no later than two years after the alleged cause occurred or its reasonable discovery by the alleged injured party." Mo. Rev. Stat. § 213.111.1 (2017).[1] It is undisputed Plaintiff's employment with Defendant concluded on May 7, 2014, but she did not file this matter until December 13, 2016. Plaintiff argues her MHRA claims are not time-barred because of the continuing nature of her claims. Plaintiff points to the fact she marked the "continuing action" box on her charge of discrimination, and she claims to have "set forth facts raising genuine disputes as to whether Defendant has recently, and on an ongoing basis, made negative and derogatory statement[s] to third parties…" Doc. #79, at 62.

"In determining the timeliness of a claim, at one end of the spectrum are events that can be identified individually as significant events." *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 253 (Mo. Ct. App. 2012) (citation and internal quotation omitted). These events are termed "discrete acts," and occur at a moment in time. *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). Discrete acts include termination, refusal to hire, failure to promote, and denial of transfer. *Id.* (citation omitted). Each of these events, which constitute a separate action for unlawful employment discrimination, start a "new clock ticking." *Id.* at 254 (citing *Morgan*, 536 U.S. at 113-14)).

---

[1] Although the MHRA was amended in 2017, the two-year limitation period remained unchanged.

5

On the other end of the spectrum are "continuing violations that consist of repeated conduct extending over a period of time." *Id.* (quoting *Morgan*, 536 U.S. at 115) (internal quotations omitted). To establish a continuing violation, a plaintiff must show "a series of closely-related similar events that occurred within the same general time period and stemmed from the same source" that "continued into the limitations period." *Id.* (quoting *Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (1999)). Courts must "look for 'day-to-day' discriminatory events that occur on a regular basis, which events may not be significant individually but establish a continuing violation due to their cumulative effect." *Id.* at 255 (quoting *Pollock*, 11 S.W.3d at 763).

For her MHRA claims to survive summary judgment, Plaintiff must establish a continuing violation through at least December 13, 2014. Simply marking a box labeled "continuing action" on a charge of discrimination does not make the act continuing in nature, particularly when the charge of discrimination does not point to any specific instances of discriminatory or retaliatory conduct occurring after Plaintiff was discharged. Further, in response to Defendant's summary judgment motion, Plaintiff identified only one instance after December 13, 2014, where Defendant allegedly retaliated against her. Plaintiff claims Defendant made derogatory statements about her in its March 15, 2016 letter to the Equal Employment Opportunity Commission ("EEOC") responding to her charge of discrimination. Doc. #79, at 43-44; Doc. #79-12. But Plaintiff does not specify which portions of the ten-page letter were derogatory. *Id.* Nonetheless, beyond the one alleged instance, Plaintiff does not set forth any argument – much less, evidence – of any other retaliatory or discriminatory acts to support her continuing violation argument.

The Court finds Plaintiff has not established "a series of closely-related similar events that occurred within the same general time period and stemmed from the same source" that "continued into the limitations period." *Tisch*, 368 S.W.3d at 254. And Plaintiff failed to set forth evidence of day-to-day discriminatory events that occurred on a regular basis at any point during the two years preceding her filing of this lawsuit. Accordingly, Plaintiff has failed to establish a continuing violation, and her MHRA claims are time-barred. Defendant's motion for summary judgment on Plaintiff's MHRA claims is granted.

### B. Plaintiff's Title VII and Section 1981 Claims

Under Title VII, Plaintiff alleges Defendant retaliated against her for complaining about discrimination, she was disparately treated, unlawfully discharged, and subjected to a hostile work environment because of her race, color, national origin, sex, and ancestry. Title VII does not specifically include "ancestry" as a protected category, but national origin encompasses ancestry. 42 U.S.C. § 2000e-2(a)(1); 29 C.F.R. § 1606.1 (defining national origin to include "an individual's, or his or her ancestor's, place of origin…"); *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (Brennan, J., concurring); *Espinoza v. Farah Mfg. Co.*, 411 U.S. 86, 88-89 (1973) (noting "national origin on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.") (citation omitted); *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 940 (7th Cir. 2012). Under section 1981, Plaintiff alleges Defendant discriminated, harassed, and retaliated against her because of her race. The same elements and analytical framework apply to claims brought pursuant to Title VII and section 1981. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056-60 (8th Cir. 1997) (citations omitted).

The Court, as it is required to do, has viewed the record before it in the light most favorable to Plaintiff, and has given Plaintiff the benefit of all inferences that may be reasonably drawn from the evidence. The Court finds Plaintiff has set forth sufficient evidence to raise genuine issues for trial with regard to her claims under Title VII and section 1981. Accordingly, Defendant's motion for summary judgment on Plaintiff's Title VII and section 1981 claims is denied.

### C. Plaintiff's Equal Pay Act ("EPA") Claim

Plaintiff claims her male predecessor, Stephen O'Neil, held the same job with the same duties and responsibilities that she held, but he was paid more than she was paid.[2] A cause of action under the Equal Pay Act "may be commenced within two years

---

[2] In responding to the statement of facts supporting Defendant's summary judgment motion, Plaintiff conceded her disparate pay claim was related to Stephen O'Neil and Marcia Molina. Doc. #79, at 38. But in the argument section of her brief, Plaintiff did not discuss or mention Molina. It may be Plaintiff recognized Molina, who is female, did not help her in establishing an EPA claim. Regardless, by failing to respond to

after the cause of action accrued…except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). To establish a claim under the EPA, a plaintiff must identify a male employee who was paid more for equal work in a job that required equal skill, effort, and responsibility, and was performed under similar working conditions. *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 421-22 (8th Cir. 2017) (citation omitted). If a plaintiff establishes a prima facie case, the burden of proof shifts to the employer to prove a statutory affirmative defense: (1) a seniority system; (2) a merit system; (3) a system measuring earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1072 (8th Cir. 2009) (citing 29 U.S.C. § 206(d)(1)). "[T]he defendant must prove that the pay differential was based on a factor other than sex." *Id.* (quoting *Simpson v. Merchants & Planters Bank,* 441 F.3d 572, 579 (8th Cir. 2006)).

There are three issues that prevent the Court from issuing a ruling on Defendant's motion for summary judgment on Plaintiff's EPA claim. First, the parties did not raise or address the applicable statutes of limitations in their briefing, and the record does not provide sufficient evidence for the Court to make a determination as to whether Plaintiff's EPA claim is timely. Second, the record is not sufficiently developed with regard to O'Neil's responsibilities and working conditions during the time he was a part-time employee. Third, based upon the briefing and record, the Court cannot ascertain if Defendant is asserting a statutory affirmative defense, and if so, which particular affirmative defense. The Court directs the parties to file supplemental briefing on these three issues. Each party's brief shall be filed on or before March 16, 2018, and shall not exceed ten pages. Responsive briefs are not necessary.

### D. Plaintiff's Appropriation of Privacy and Publicity Claim

Misappropriation of name is one of four torts falling under the invasion of privacy umbrella. *Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. banc 2003) (citation

---

Defendant's argument regarding her EPA claim related to Molina, Plaintiff tacitly conceded that claim. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).

omitted); *Nemani v. St. Louis Univ.*, 33 S.W.3d 184, 185 (Mo. banc. 2000) (citation omitted). "[D]evelopment of the misappropriation of name tort has given rise to a separate yet similar tort termed the 'right of publicity,' which is said to 'protect a person from losing the benefit of their [sic] work in creating a publicly recognizable persona.'" *Id.* (quoting *Bear Foot, Inc. v. Chandler,* 965 S.W.2d 386, 389 (Mo. Ct. App. 1998)). The protections for each tort are slightly different. Misappropriation of name "protects against intrusion upon an individual's private self-esteem and dignity, while the right of publicity protects against commercial loss caused by appropriation of an individual's [identity] for commercial exploitation." *Id.* (citations omitted). Despite differences in the types of damages recoverable for the two torts, the elements of both torts are basically the same. "To establish the misappropriation tort, the plaintiff must prove that the defendant used the plaintiff's name without consent to obtain some advantage." *Id.* at 368. Rights of privacy do not "subvert those rights which spring from social conditions, including business relations." *Nemani*, 33 S.W.3d at 185-86.

Plaintiff contends Defendant misappropriated her name and publicity by keeping her work email account active after her employment terminated. Doc. #71-34, at 4. She claims "[k]eeping [her] email active gave the false impression that she was still employed and could be reached at that address." *Id.*; Doc. #79, at 74. It is undisputed that Plaintiff's work email account belonged to Defendant, and Defendant did not send any message from Plaintiff's work email account. Instead, it is Defendant's receipt of emails through Plaintiff's work email account without her knowledge or permission that forms the basis of Plaintiff's claim.

It should come as no surprise to Plaintiff that Defendant monitored her work email after her employment was terminated. Defendant's Internet Use and Content Policy notified employees that Defendant had access to employees' authorized user accounts, and it reserved the right to "access, examine, disclose and monitor any and all aspects of its computer system including…reviewing e-mail sent and received." Doc. #71-10, at 3. The policy furthers states employees "waive any right to privacy in anything they create, store, send, or receive on the computer." *Id.* Defendant's Code of Conduct informed employees that Defendant had "the right to monitor and/or access"

9

electronic mail. Doc. #71-40, at 5. Also, it was Defendant's practice to leave the employee's email address active for a period of time to avoid disruption in the work.

As Defendant's employee, Plaintiff impliedly, if not explicitly, consented to Defendant's monitoring and accessing of her work email account. And she waived any right to privacy in messages sent from or received by her work email account. Due to Plaintiff's consent and waiver, her claim for appropriation of privacy and publicity based solely upon Defendant's receipt of email from third parties by way of an email account owned by Defendant fails.

Regardless of whether she consented to Defendant monitoring her work email account or whether she waived her right to privacy in her work email account, Plaintiff failed to set forth any evidence that Defendant's receipt of emails from third parties on the email account Defendant provided to Plaintiff equates to "pirating" Plaintiff's identity for "some advantage." In fact, there is no evidence that Defendant obtained any advantage for keeping Plaintiff's work email account active for a period of time after her employment concluded. For these additional reasons, Plaintiff's claim for appropriation of privacy and publicity fail. Defendant's motion for summary judgment on this claim is granted.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted with regard to Plaintiff's Missouri Human Rights Act claims, and appropriation of privacy and publicity claim. Defendant's motion for summary judgment is denied with regard to Plaintiff's Title VII and section 1981 claims. The Court defers ruling on Defendant's motion for summary judgment on Plaintiff's EPA claim, and directs the parties to file supplemental briefing, as explained *supra*.

IT IS SO ORDERED.

DATE: March 6, 2018

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT